953 F.2d 638
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
Joyce OHAJAH, Petitioner,
v.
U.S. IMMIGRATION & NATURALIZATION SERVICE, Respondent.
 No. 91-1091.
 United States Court of Appeals, Fourth Circuit.
 Argued Oct. 28, 1991.
Decided Jan. 28, 1992.
 
 On Petition for Review of an Order of the Board of Immigration Appeals. ( Afe-lfx-shu)
 Argued: Steven James O'Connor, Rose, Ray, Winfrey & O'Connor, P.A., Fayetteville, N.C., for petitioner; Alice Marie King, Office of Immigration Litigation, Civil Division, United States Department of Justice, Washington, D.C., for respondent.
 On Brief: Stuart M. Gerson, Assistant Attorney General, Mark C. Walters, Assistant Director, Office of Immigration Litigation, Civil Division, United States Department of Justice, Washington, D.C., for respondent.
 
 
 1
 D.Md.
 
 
 2
 AFFIRMED.
 
 
 3
 Before MURNAGHAN and NIEMEYER, Circuit Judges, and ALEXANDER HARVEY, II, Senior United States District Judge for the District of Maryland, sitting by designation.
 
 OPINION
 NIEMEYER, Circuit Judge:
 
 4
 Joyce Ohajah, a citizen of the United Kingdom, appeals from a final order of deportation issued by the INS on the ground that she never received notice that the INS had changed her status from permanent resident alien to non-immigrant visitor because it found that her marriage to a United States citizen was fraudulent. We find that the record contains substantial evidence to support the INS's conclusion that Ohajah received adequate notice and therefore affirm.
 
 
 5
 Ohajah legally entered the United States in November 1982 as a visitor and was authorized to remain until May 26, 1983. On the basis of her marriage to Chester Hicks, a United States citizen living in El Paso, Texas, the INS adjusted her status on August 13, 1984, to that of permanent resident alien. Prior to her marriage she lived in El Paso with her father, who had come to the United States to attend university. Her father arranged the wedding with Hicks and was the only witness to the wedding, although Hicks had family in the area. A few months after Ohajah's change of status to a permanent resident alien, she and Hicks were separated. She filed for a divorce shortly thereafter.
 
 
 6
 The INS began an investigation into the legitimacy of the marriage between Ohajah and Hicks about a year later when it received an anonymous tip. The caller stated that Ohajah had obtained her permanent residence status by paying Hicks to marry her and that Ohajah and Hicks had never lived together as husband and wife.
 
 
 7
 The INS visited Hicks' apartment complex and interviewed the manager there who said that Hicks never lived with a woman and had been evicted from the complex for the non-payment of rent in February, 1985, after Ohajah had filed for a divorce. Hicks was later located in Dallas, Texas where he was interviewed under oath. He gave a long and detailed story of how Ohajah's father persuaded him over a period of time to marry Ohajah in order that she could obtain permanent resident status in the United States. Ohajah's father also advised Hicks that there would be no permanent obligation from the marriage. Hicks stated that he never lived with Ohajah, that he and Ohajah had never intended to live together, and that the marriage was never consummated. He described the marriage as a joint visit to City Hall, a drink at Ohajah's father's apartment, and a parting of the ways.
 
 
 8
 Thereafter, in March 1987, the INS was able to interview Ohajah in the presence of her attorney, David Chew. Chew had filed a form G-28, Notice of Appearance as Ohajah's attorney, for all immigration matters. At the interview Ohajah testified to a different story. She stated that her marriage with Hicks was consummated and denied any fraud. Following the interview, which was under oath and on the record, the INS sent her the transcript, in care of Chew, so that she could sign it. Chew responded with a letter stating that Ohajah had left El Paso and that he did not know where she was presently located. She left no forwarding address with either him or the INS.
 
 
 9
 The INS district director in El Paso concluded that Ohajah's marriage was fraudulent and commenced proceedings to rescind her change of status to permanent resident alien. Notice of the proceedings was sent by certified mail to Chew on May 31, 1988 and a receipt, signed by a person in Chew's office, was returned and entered into Ohajah's file. Because Ohajah filed no response to the notice within the requisite 30 days, the district director rescinded Ohajah's permanent resident alien status without a hearing. Notice of this action was again sent to Chew by certified mail. Accompanying the notice was an order directing Ohajah to surrender her alien registration card and to depart the United States.
 
 
 10
 Approximately two years later, on June 20, 1990, the INS sent Ohajah an order to show cause why she should not be deported for overstaying her original visa. The order was mailed by certified mail to Ohajah at an address in Fayetteville, North Carolina, which the INS obtained in the course of investigating Ohajah's father. Ohajah responded through her present attorney, Stephen O'Connor, denying any fraud and requesting an evidentiary hearing on the merits of the rescission order because of inadequate notice. She also filed a motion with the District Director to reopen the rescission proceedings for the same reason. On November 14, 1990, at a master calendar hearing before the Immigration Judge, O'Connor was handed the order of the District Director denying the request to reopen, leaving Ohajah no defense to an order of deportation. Ruling on the basis of Matter of Rodriguez-Esteban, Int.Dec. 3115 (BIA 1989), which precludes review by Immigration Judges of rescission orders, the Immigration Judge proceeded to the merits of the show cause order, received evidence offered by the INS, and concluded with the issuance of a deportation order. On appeal Ohajah raised the notice issue and the Board of Immigration Appeals entered an order dismissing the appeal. This petition for review followed.
 
 
 11
 Before we reach the merits of Ohajah's challenge we must address the INS's contention that we have no jurisdiction over the notice issue because judicial review is limited to the deportation hearing itself and does not extend to rescission hearings upon which the deportation order depends. Section 106(a) of the Immigration and Nationality Act of 1952 provides for judicial review by the Court of Appeals only "for all final orders of deportation." 8 U.S.C. § 1105a(a) (1988). The INS argues that the actual rescission ruling was not appealed and cannot therefore be before us now.
 
 
 12
 Ordinarily we would agree with the INS that we ought not to review earlier proceedings. In this case, however, the deportation order, which concededly is appealable, depends on a valid order of rescission of Ohajah's status as a permanent resident alien. When Ohajah contends that she received no notice of the rescission proceedings, she necessarily challenges an element of the deportation order which is before us. Moreover, if indeed she received no notice, this is the first opportunity for her to challenge the notice. We find this circumstance to be more analogous to the holding of INS v. Chadha, 462 U.S. 919 (1983), in which the Supreme Court approved review of an earlier collateral matter on which a deportation order depended, than that of Cheng Fan Kwok v. INS, 392 U.S. 206 (1968), in which a deportation order did not depend on the collateral matter sought to be reviewed. Accordingly we will proceed to review the adequacy of notice of the rescission proceeding because the deportation order depends on a valid rescission order.
 
 
 13
 On the merits, Ohajah challenges the adequacy of notice to her of the INS's intent to rescind her adjustment of status and of the rescission order itself. Although she "vigorously denies" that her marriage was a sham, the ground for rescission of her adjustment of status, she does not now seek review in this court of the merits of the rescission proceeding. Rather, she demands that she be given a hearing to present her case because she received no notice of the earlier proceeding.
 
 
 14
 Although both the Immigration Judge and the Board of Immigration Appeals refused to review the rescission proceedings, the Immigration Judge nevertheless found that Ohajah received proper notice of the rescission proceedings, and the BIA affirmed those findings. We will therefore sustain them if they are "supported by 'reasonable, substantial, and probative evidence on the record considered as a whole.' " Mortazavi v. INS, 719 F.2d 86, 87 (4th Cir.1983) (quoting 8 U.S.C. § 1105a(a)(4) (1988)).
 
 
 15
 The record of Ohajah's rescission proceedings includes the form G-28 notice of appearance filed by Chew when he accompanied Ohajah to her INS interview in March 1987. This form, which is signed by Ohajah, declares that Chew represents her in connection with "any and all immigration and/or nationality matters." Although the record also includes Chew's letter of June 24, 1987, indicating that he had lost contact with Ohajah, neither that letter nor any other evidence in the record suggests that Ohajah withdrew Chew's power to act as her attorney or that Chew withdrew as her attorney. Cf. Newton v. INS, 622 F.2d 1193 (3rd Cir.1980) (holding that alien received due process despite failure to notify current attorney, because notice was sent to previous attorney, whose appearance had not been withdrawn and who sent a secretary with the alien to the final deportation hearing). While Ohajah's decision to become incommunicado carries with it the risk of not receiving actual notice, it does not remove the authority of her attorney, or more importantly, the INS to proceed under procedures reasonably calculated to give her notice. Indeed, her decision in this case violated an affirmative obligation to keep the INS advised of her current address. See 8 U.S.C. § 1305 (1988) and 8 C.F.R. § 265.1 (1991).
 
 
 16
 There is ample evidence that notice of the rescission proceedings and order was in fact given to Chew, her attorney. These notices were sent by registered mail to Chew and receipts for them were returned to the INS and are in the record. There is thus substantial evidence in the record to support the finding that Ohajah received requisite notice by service on her attorney. Cf. Reyes-Arias v. INS, 866 F.2d 500 (D.C.Cir.1989) (refusing to require actual notice to alien of deportation hearing's date, rather than mere notice to attorney, where alien failed to appear at hearing). Without disputing these facts, Ohajah contends that service of this notice upon Chew failed to comply with the INS's own regulations on providing notice.
 
 
 17
 The INS's regulations provide that notice of intent to rescind an adjustment of status must be given by "personal service," see 8 C.F.R. § 246.1 (1991), and personal service is defined to be:
 
 
 18
 (i) Delivery of a copy personally;
 
 
 19
 (ii) Delivery of a copy at a person's dwelling house or usual place of abode by leaving it with some person of suitable age and discretion;
 
 
 20
 (iii) Delivery of a copy at the office of an attorney or other person, including a corporation, by leaving it with a person in charge;
 
 
 21
 (iv) Mailing a copy by certified or registered mail, return receipt requested, addressed to a person at his last known address.
 
 
 22
 Moreover, "whenever a person is required by any of the provisions of this chapter to give or be given notice, ... such notice ... shall be given by or to ... the attorney or representative of record or the person himself if unrepresented." 8 C.F.R. § 292.5 (1991).
 
 
 23
 Ohajah argues that these regulations require that service be effected only by personal delivery at the attorney's office and not by certified mail, as was done in this case. This interpretation would limit the method of service to personal delivery whenever an alien is represented by counsel. The INS contends that this was clearly not the intent of its regulations and that the only reasonable interpretation, taking the regulations together, is to construe the section which authorizes the mailing of service "to a person" to apply to the section substituting attorneys for represented "persons" to be served. While that interpretation is a reasonable one, particularly when considering the fact that that makes the methods of service parallel to those adopted generally by the federal rules, in this case the issue is not squarely presented. Ohajah does not contest the fact that Chew received actual notice. Accordingly we reject Ohajah's argument that notice to Chew was inadequate because the notice was not personally served on him or someone in his office.
 
 
 24
 Finally, Ohajah challenges the decision of the District Director of the INS not to reopen the rescission proceedings. She bases her challenge on the same contention that she did not receive adequate notice of the proceedings. The District Director denied her motion because she "failed to present any evidence to overcome the grounds for termination." We review this decision only for an abuse of discretion. See INS v. Abudu, 485 U.S. 94, 105 (1988) (applied to BIA's denial under 8 C.F.R. § 3.2 of motion to reopen). In light of our conclusion that the INS did comply with its regulations and of Ohajah's failure to advance any other evidence justifying a reopening of the rescission proceedings, we conclude that the District Director did not abuse his discretion in refusing to reopen the matter.
 
 
 25
 In summary, because substantial evidence in the record supports the finding that Ohajah received the requisite notice of the INS's intent to rescind her adjustment of status and of the rescission order itself, we affirm the decision of the BIA finding Ohajah deportable and dismissing her appeal.
 
 
 26
 AFFIRMED.
 
 
 27
 MURNAGHAN, Circuit Judge, and ALEXANDER HARVEY, II, District Judge, joined.